IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

HUNTSVILLE GOLF                    )
DEVELOPMENT, INC.,                 )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        No. 1:08-00006
                                   )        JUDGE HAYNES
BRINDLEY CONSTRUCTION              )
COMPANY, INC., et al.,             )
                                   )
        Defendants.                )

## M E M O R A N D U M

Plaintiff, Huntsville Golf Development, Inc., an Alabama corporation, filed this action

under 28 U.S.C. § 1332, the federal diversity jurisdiction statute, against the Defendants:

Brindley Construction, LLC (formerly The Brindley Company, LLC), a Tennessee limited

liability company, Brindley Construction Group, L.L.C., a Tennessee limited liability company,

The Brindley Company (formerly Brindley Development Corporation), a Tennessee corporation,

Brindley & Associates, Inc., a Tennessee corporation, Brindley Development Company, L.L.C.,

a Tennessee limited liability company, Brindley Holdings, L.P., a Tennessee limited partnership,

Brindley Homes Corporation, a Tennessee corporation, The Brindley Company, L.P., a

Tennessee limited partnership, Brindley Construction Company, Inc., a Tennessee corporation,

(collectively, the "Brindley entities"), Robert Brindley, Sr., a Tennessee citizen, and Ronald B.

Brindley, a Tennessee citizen, (collectively, the "Individual Defendants").  Plaintiff asserts

claims to enforce a judgment through piercing the corporate veil, improper dissolution and

fraudulent conveyance of assets.

Plaintiff's claims arise from a prior judgment rendered on December 24, 1992, in

1

Plaintiff's favor against Brindley Construction Company, Inc. ("BCCI") in the United States District Court for the Northern District of Alabama. Plaintiff contends that Defendants Robert Brindley, Sr. and Ronald Brindley utilized a series of corporate entities, namely the Brindley entities, to prevent Plaintiff from collecting on the judgment. On April 24, 2001, Plaintiff registered its judgment in the United States District Court for the Middle District of Tennessee. Subsequently, BCCI was dissolved and ceased operations. Plaintiff contends, however, that the individual Defendants continued operations under the other Brindley entities to prevent Plaintiff from lawfully collecting on its judgment.

A bench trial was held on September 21-23, 2010, and set forth below are the Court's findings of fact and conclusions of law. At the conclusion of the trial, the Court directed the parties to submit proposed findings of fact and conclusions of law.

Plaintiff's proposed findings contend, in essence: (1) that the Brindley entities are the alter egos of Robert Brindley, Sr. and/or Ronald Brindley; (2) that liability is not limited solely to the parent company that existed at the time of the transaction underlying the judgment; (3) that Plaintiff did not waive its claim against Brindley & Associates, Inc. and Brindley Homes Corporation, because this action to pierce the corporate veil is relates back to the original action against BCCI that resulted in a judgment; and (4) that the facts establish Plaintiff's claims of improper dissolution and fraudulent conveyance of assets.

Defendants contend, in sum: (1) that Plaintiff's proof is insufficient to show that BCCI's actions constituted fraud or injustice to warrant piercing BCCI's corporate veil; (2) that Plaintiff' proof fails to show that any of the Brindley entities is the alter ego of Robert Brindley, Sr. and/or Ronald Brindley; (3) that neither BCCI nor Robert Brindley, Sr. made any fraudulent or inappropriate transfers; and (4) Plaintiff's proof fails to establish any liability of Ronald

2

Brindley.

For the reasons set forth below, the Court concludes that liability for the prior judgment exists as to the Brindley entities and Robert Brindley, Sr., but Plaintiff has failed to offer sufficient proof to hold Defendant Ronald Brindley liable. Accordingly, the Court will enter a judgment against Robert Brindley, Sr. and the Brindley entities in the amount of the prior judgment, plus pre-judgment and post-judgment interest.

## A. Findings of Fact

### 1. Plaintiff / BCCI Arbitration and Judgment

In December 1989 and February 1990, Plaintiff and BCCI executed a series of agreements for construction of condominium residential units in Huntsville, Alabama. (Docket Entry No. 187, Stipulation at ¶¶ 1-2). A dispute arose between the parties, and pursuant to the agreements, the parties entered into arbitration. Id. at ¶ 5. On August 16, 1992, an arbitrator awarded Plaintiff $376,316.75 against BCCI. Id. at ¶ 6. On August 24, 1992, Plaintiff filed a complaint in the United States District Court, Northern District of Alabama, Northeastern Division, seeking a confirmation of the arbitration award pursuant to 9 U.S.C. § 9.

On September 9, 1992, approximately one month after the arbitration award was issued, The Brindley Company, Inc. amended its charter to change its purpose to encompass the purposes adopted by BCCI. (Plaintiff's Exhibit 164). Ronald Brindley and Robert Brindley, Sr. executed the August 10, 1992 amendment to the charter as shareholders and directors of The Brindley Company, Inc. Id. On October 9, 1992, BCCI, by a company resolution, guaranteed the $385,000 personal loan of Robert Brindley, Sr. to First National Bank of Pulaski. (Plaintiff's Exhibit 128). Ronald Brindley voted to approve Action of the guarantee of the obligations of Robert Brindley, Sr. at First National Bank of Pulaski. (Defendants' Exhibit 9). BCCI also

agreed, without the payment of compensation, that BCCI would not compete with The Brindley Company. (Docket Entry No. 214, Trial Transcript at p. 253-54).

On December 23, 1992, the Alabama District Court confirmed the arbitrator's award. (Docket Entry No. 187, Stipulation at ¶ 8). Five days after the confirmation of Plaintiff's arbitration award, on December 28, 1992, BCCI's Board of Directors resolved to stop bidding on new contracts. (Plaintiff's Exhibit 129). At trial, Defendants offered the testimony of Robert Brindley, Sr. that BCCI began winding down in 1992. (Docket Entry No. 213, Trial Transcript at p. 191). On March 5, 1993, Plaintiff filed applications for writs of execution and a statement for a judgment creditor requesting garnishment or execution in the United States District Court for the Middle District of Tennessee. (Plaintiff's Exhibit 238 at Huntsville 1454). Although the garnishments were issued, First National Bank of Pulaski filed a motion to quash the garnishments, alleging a superior position based upon the October 9, 1992 guarantee of Robert Brindley, Sr.'s loan by BCCI. (Plaintiff's Exhibits 237 and 239). By Agreed Order, the garnishments issued by Plaintiff were dismissed. (Plaintiff's Exhibit 239).

BCCI provided financial statements for 1987, 1988, 1989, 1990, 1991, and 1992. In 1992, however, BCCI provided incomplete financial statements. (Docket Entry No. 214, Trial Transcript, testimony of Dr. Nicole Jenkins at p. 214-15). After 1992 and through the remainder of its existence, BCCI provided no financial statements. Id. at 215.

Articles of dissolution for BCCI were signed and filed by Robert Brindley Sr. on March 11, 2002. (Docket Entry No. 213, Trial Transcript at p. 177). On November 1, 2002, Plaintiff issued requests for production of documents and interrogatories to BCCI seeking all financial and accounting records, accounts receivable records, annual financial statements, accounts payable, and profit and loss statements. (Plaintiff's Exhibit 236).

4

## 2. Brindley Entities

Brindley & Associates, Inc., formerly known as Gileco Land Development, was formed on July 12, 1976 and is still currently active. (Plaintiff's Exhibit 222, Defendants' Exhibit 4). Robert Brindley, Sr. initially solely owned Brindley & Associates, Inc., but Ronald Brindley also acquired stock in Brindley & Associates, Inc. in September 1991. Id. Ronald Brindley testified that he was, "an active participant in Brindley, the various Brindley entities for over 20 years." (Docket Entry No. 213, Trial Transcript at pp. 154-55). Ronald Brindley served as a director of Brindley & Associates, Inc. from 1990 to 2009 and served as vice-president or president from 1990 to 2009. (Defendants' Exhibit 4). Robert Brindley, Sr. served as a director of Brindley & Associates, Inc. from 1990 to 2009 and served as vice-president or president from 1990 to 2009. Id.

Brindley Homes Corporation was formed on September 9, 1987, with Robert Brindley, Sr. as the primary shareholder. Brindley Homes Corporation remains active. (Defendants' Exhibit 10). Robert Brindley, Sr. served as a director of Brindley Homes Corporation from 1987 to 2009 and served as president of Brindley Homes Corporation from 1987 to 2009. Ronald Brindley served as a director of Brindley Homes Corporation from 1990 to 2007 and served as vice-president of Brindley Homes Corporation from 1991 to 2009. Id.

Brindley Development Corporation was formed on November 20, 1987, with Robert Brindley, Sr. as its sole owner and president from 1989 to 1992. (Defendants' Exhibit 11). Brindley Development Corporation operated under the trade name The Brindley Company. Id. On March 15, 1989 Brindley Development Corporation later changed its name to The Brindley Company. Id. Robert Brindley, Sr. also served as a director of The Brindley Company from 1992 to 2002. Id. In 1992, Ronald Brindley acquired an interest in The Brindley Company,

while Robert Brindley, Sr. retained an interest in The Brindley Company through 2002. Id. Ronald Brindley served as a director of The Brindley Company from 1992 to 2002 and served as president of The Brindley Company from 1992 to 2002. Id.

The Brindley Company, L.P. was formed on March 13, 1989. (Plaintiff's Exhibit 222). Defendants did not produce any documents in response to discovery or at trial for The Brindley Company, L.P. except for one tax return.

Brindley Construction Group, LLC formed on October 23, 1997 with Robert Brindley, Sr. and Ronald Brindley each owning interests in the company. Brindley Construction Group, LLC is still currently active. (Plaintiff's Exhibit 222). Robert Brindley, Sr. served as a Member/Manager/Governor of Brindley Construction Group, LLC from 1997 to 2009. (Defendants' Exhibit 8). Ronald Brindley served as a member/manager/governor of Brindley Construction Group, LLC from 1997 to 2009, and in September 1997 authorized the sale of business assets of The Brindley Company to Brindley Construction Group, LLC. Id. In 2007, Ronald Brindley and Robert Brindley, Sr. authorized the transfer of assets from Brindley Construction Group, LLC, without a determination of fair market value, to Brindley Construction, LLC (formerly The Brindley Company, LLC). (Plaintiff's Exhibits 22 and 43; Docket Entry No. 214, Trial Transcript at p. 261).

Brindley Development Company, LLC was formed on March 30, 1998, and is still currently active. (Plaintiff's Exhibit 222). Robert Brindley, Sr. and Ronald Brindley owned interests in Brindley Development Company, LLC from 1998 through 2009 and each served as a member/manager. (Defendants' Exhibit 5).

Brindley Holdings, L.P. formed on December 28, 2000 and is still currently active. (Plaintiff's Exhibit 222). Brindley Holdings, L.P. is owned by Robert Brindley, Sr., Ronald

Brindley, Robert Brindley, Jr., Jeffrey Brindley, and BRINCO Group, Inc., with BRINCO Group, Inc. being its general partner.  Id.  Beginning in April 2002, Ronald Brindley owned an interest in Brindley Holdings, L.P.  (Defendants' Exhibit 7).  Robert Brindley, Sr. owned a 96% interest in Brindley Holdings, L.P, but later assigned his interest to the Robert Brindley, Sr. Revocable Trust in January 29, 2002.  Id.  Ronald Brindley is the president of BRINCO Group, Inc., the general partner of Brindley Holdings, L.P.  Id.

Brindley Construction, LLC, formerly The Brindley Company, LLC, formed on April 29, 2004, and remains active.  (Plaintiff's Exhibit 222).  Ronald Brindley owned an interest in The Brindley Company, LLC in 2004.  (Defendants' Exhibit 6).  On October 5, 2005, The Brindley Company, LLC changed its name to Brindley Construction, LLC.  Ronald Brindley served as a Member of The Brindley Company, LLC and Brindley Construction, LLC from 2004 to 2009. Id.  Robert Brindley, Sr. also owned an interest in Brindley Construction, LLC and The Brindley Company, LLC and served as a Member/Manager of Brindley Company, LLC and Brindley Construction, LLC from 2004 to 2009.  Id.

The Brindley entities observed varying levels of corporate formalities throughout their existence.  The Brindley Company provided financial statements for 1994, 1995, and 1996.  Id. at 214.  Brindley Construction Group, LLC provided financial statements for 1997, 1998, 1999, 2000, 2001, and 2003.  Id.  Brindley Construction, LLC provided internally audited financial statements for 2005, 2006, and 2008.  Id.  Brindley Holdings, L.P. provided no financial statements during its existence.  Id. at 215.  The Brindley Company provided no financial statements during its existence.  Id.  Brindley Associates provided no financial statements for any of the years of its existence.  Id. at 216.  Brindley Development Corporation provided no financial statements during its existence.  Id.  Brindley Development Company provided no

7

financial statements during its existence.  Id.  Finally, Brindley Homes provided no financial

statements during its existence.  Id.

BCCI formed as a Tennessee corporation and filed its charter with the Tennessee

Secretary of State on January 29, 1982.  Robert Brindley, Sr. was the sole shareholder of BCCI.

(Docket Entry No. 213, Trial Transcript, testimony of Robert Brindley, Sr. at p. 171).  Robert

Brindley, Sr. served as a director of BCCI from 1982 to 2001 and served as president of BCCI

from 1982 to 2002.  (Defendants' Exhibit 9).  Ronald Brindley served as a director of BCCI from

1988 to 1993 and served as vice-president of BCCI from 1992 to 2001.  Id.  Minutes of the first

meeting of the incorporator and subscriber were recorded on February 1, 1982 that discuss the

corporation's stock and adoption of bylaws.  (Plaintiff's Exhibits 59 and 68).  Robert Brindley,

Sr. subscribed to purchase all stock issued by BCCI.  (Plaintiff's Exhibit 60).  Minutes of the first

meeting of the shareholders and the bylaws of BCCI were also recorded, and initial members of

the board of directors were appointed.  (Plaintiff's Exhibit 64).

From February 1, 1982 through April 16, 1992, BCCI held at least 32 meetings of the

board of directors, including annual meetings and special meetings, to determine various matters.

(Plaintiff's Exhibits 69-125).  From May 1, 1992 through May 3, 1993, the board of directors of

the company signed at least six actions by unanimous written consent in lieu of a meeting.

(Plaintiff's Exhibits 126-131).

### 3. The Brindley Entities' Corporate Practices

The Brindley entities failed to produce various corporate records, minutes, resolutions,

and articles whose creation and retention would be deemed necessary and appropriate for proper

record keeping.  (Docket Entry No. 214, Trial Transcript at p. 216).  There was also a pattern of

undocumented loans by the various Brindley entities to other Brindley entities or Robert

Brindley, Sr. that failed to assure the independence of each entity. (Plaintiff's Exhibit 227 at 4). The sale of assets between The Brindley Company and Brindley Construction Group, LLC lacked documentation in their corporate records of the specific assets and liabilities that were transferred and acquired. Id. at 12.

When the assets of Brindley Construction Group, LLC were transferred to Brindley Construction, LLC, documentation related to the fair value of the assets transferred was not provided. Id. at 14. In the intercompany transactions among the Brindley entities, and more particularly BCCI, there was not any evidence that the transactions were at fair market value. (Docket Entry No. 214, Trial Transcript at p. 216). Additionally, the obligations of the Brindley entities to one another were not appropriately recorded. Id. at 276. For example, when vehicles were transferred between Brindley entities in the records of the Tennessee Department of Revenue Taxpayer and Vehicle Services Division reflect that the transfers of vehicles are not on the books, records, or other corporate documents of the applicable Brindley entities. (Plaintiff's Exhibit 227 at 15).

Where Brindley entities operated out of the same location, these entities failed to allocate costs, to determine fair market values, or to justify the gratuitous provision of office space, equipment, or other services. (Docket Entry No. 214, Trial Transcript at p. 233). Documents produced by the Defendants do not reflect allocations of an equitable portion of the expenses for the use of office space and equipment among the Brindley entities. (Plaintiff's Exhibit 227 at 17).

The Brindley entities acted as component members of a single entity that commingled assets and undermined the profit maximization of different Brindley entities to the detriment of their creditors and other third parties. (Docket Entry No. 214, Trial Transcript at p. 225). BCCI

and Robert Brindley, Sr. entered into a series of agreements beginning December 1, 1992, purporting to lease space at fair market value. The fair market value, however, is not shown for that lease, nor its subsequent extension. Id. at 230. Defendants did not provide any evidence of compensation when employees of BCCI moved to The Brindley Company and successively to other Brindley entities. Id. at 257.

On November 25, 2003, Brindley & Associates assigned leases held by it to First National Bank of Pulaski as collateral for two notes executed by Brindley Holdings, L.P. in the respective amounts of $1,506,374.90 and $190,685.67. (Plaintiff's Exhibit 186). Neither the corporate records of Brindley & Associates nor Brindley Holdings, L.P. provide any justification of the assignment of income of Brindley & Associates for the benefit of Brindley Holdings, L.P. Id.

On September 1, 1997, when The Brindley Company's assets were transferred to Brindley Construction Group, LLC, Ronald Brindley and Robert Brindley, Sr. were shareholders and officers of The Brindley Company and BCCI. (Defendants' Exhibit 11). Corporate records fail to show any resolutions or minutes of either the transferring Brindley entities or Brindley Holdings for the acquisition of property from Robert Brindley, Sr., Ronald Brindley, or any of the Brindley entities. (Docket Entry No. 214, Trial Transcript at p. 273).

Where loans were made among the Brindley entities, the loans were not supported by promissory notes or detailed discussions in the board of directors' minutes or corresponding other documentation customary for normal business practices. (Plaintiff's Exhibit 227 at 20). The statement of returned earnings necessary to reconcile the change in returned earnings in the 1994 financial statements for The Brindley Company is also missing. Id. at 25. Defendants have not presented any evidence of loans, interest payments, acquisitions, approval of purchases,

approval of sales in the minutes or resolutions or Brindley Holdings or any of the Brindley entities concerning the transfer of property from Robert Brindley, Sr. and the Brindley entities to Brindley Holdings. (Docket Entry No. 214, Trial Transcript at p. 274).

Defendants did not provide records reflecting fair market value of transfers between Robert Brindley, Sr., Ronald Brindley, or any of the Brindley entities to Brindley Holdings. Id. at 413. Brindley Construction Group, LLC transferred its assets in 2007 to Brindley Construction, LLC (formerly The Brindley Company, LLC), but a calculation of fair market value is not reflected on the books and records of either corporation. (Plaintiff's Exhibits 22, 43; (Docket Entry No. 214, Trial Transcript at p. 261). No quit claim deeds, contracts, agreements to purchase and sell, deeds of sale are reflected in the records of either the transferring Brindley entities or Brindley Holdings for the acquisition of property by Brindley Holdings from Robert Brindley, Sr., Ronald Brindley, or any of the Brindley entities. (Docket Entry No. 214, Trial Transcript at p. 273).

As to the loan guarantee for the benefit of Robert Brindley, Sr., no promissory notes, corporate resolutions, or other corporate documents reflect the tender of monies as consideration for the guarantee of Robert Brindley, Sr.'s loan by BCCI Id. at 217. Defendants did not present any evidence that Robert Brindley, Sr. tendered money, paid money, or loaned money to BCCI in the aggregate or in a singular amount of $385,000 to justify the guarantee of Robert Brindley, Sr.'s $385,000 loan. Id. at p. 223. At trial, defense counsel stated that Defendants did not know the terms of any promissory note to support the issuance of the guarantee of Robert Brindley, Sr.'s personal obligation to First National Bank of Pulaski. (Docket Entry No. 215, Trial Transcript at pp. 512-13).

As The Brindley Company ceased to do business, it transferred assets without any

documentation reflecting the fair market value of the assets transferred. (Docket Entry No. 214, Trial Transcript at p. 258). While the Giles County Tax Assessor's records reflect a transfer of BCCI's tangible assets to other Brindley entities, the Brindley entities' corporate records do not reflect transfers or compensation for tangible assets from BCCI to another Brindley entity. (Docket Entry No. 214, Trial Transcript at p. 262).

Forty-six days after Huntsville Golf Development, Inc. filed its arbitration award in the Alabama Federal District Court, the Board of Directors of BCCI resolved to guarantee the personal obligations of Robert Brindley, Sr. with First National Bank of Pulaski. Id. at 216. The October 9, 1992 resolution authorized the "Unconditional Guarantee" of certain of the obligations of Robert Brindley, Sr. to First National Bank of Pulaski in the aggregate amount of $385,000. (Plaintiff's Exhibit 128). The Collateral Assignment And Security Agreement provided that BCCI was guaranteeing "certain of the obligations of Robert Brindley, Sr...." (Plaintiff's Exhibit 255). No evidence exists that the obligation was a debt of BCCI, rather, the evidence reflects that it was a personal obligation of Robert Brindley, Sr. (Docket Entry No. 214, Trial Transcript at p. 280).

At the time that BCCI guaranteed the loan of Robert Brindley, Sr., it appeared to be "a company that was in trouble." Id. at p. 371. The gratuitous payment of Robert Brindley, Sr.'s loan by BCCI was to the detriment of BCCI's creditors. Id. at 226. The October 9, 1992 resolution of the Board of Directors of BCCI did not describe the nature or the date of the "obligations incurred" by Robert Brindley, Sr. for BCCI, nor did it describe how BCCI benefited from the obligations incurred by Robert Brindley, Sr. (Plaintiff's Exhibit 128). Defendants' assertions that the loan guarantee occurred because the loan was made for the benefit of BCCI are not supported by the evidence presented at trial.

In conformance with the October 9, 1992 resolution, BCCI entered into a Loan

Agreement and Collateral Assignment And Security Agreement with First National Bank of

Pulaski. (Plaintiff's Exhibit 237). Each Defendant averred that, "any loans between the

Brindley entities or between the Brindley entities and Robert Brindley, Sr. or Ronald Brindley

were evidenced by promissory notes and were subject to interest charges." (Plaintiff's Exhibit

241). BCCI did not conform with standard business practices for closely held entities that

require that loans be well documented, all the terms defined, the principal, the payment period,

and the market rate interest that is going to be paid. (Docket Entry No. 214, Trial Transcript at p.

229). BCCI did not record any obligations to its shareholder, Robert Brindley, Sr., in its 1992 or

1993 financial statements. Id. at p. 276. BCCI's corporate minutes and resolutions from 1982 to

1993 were introduced into evidence by the Defendants, but neither the resolutions or other

corporate documents for the period 1982-1993 reflect a loan of monies by Robert Brindley, Sr. to

BCCI to support the guarantee of Robert Brindley, Sr.'s personal loan. (Defendants' Exhibit 9;

Plaintiff's Exhibits 45-136).

Among the security mechanisms utilized to secure the guarantee of Robert Brindley, Sr.'s

personal debt to First National Bank of Pulaski was a UCC-1 statement in the "maximum

principal indebtedness for Tennessee recording tax purposes of $385,000, which was executed

and filed according to law." (Plaintiff's Exhibit 252). The UCC-1 statement listed as items

pledged to secure the loan as all of the rights, title, and interest of BCCI in several pages of

tangible assets, including office equipment, data processing equipment, furniture, fixtures,

various construction equipment, welders, tools, carpet, wall hangings, wall paper, executive

chairs, window blades, lateral filing cabinets, construction equipment, supplies, accounts

receivable, and lumber and metal items then owned or thereafter acquired. Id.

BCCI further secured the loan of Robert Brindley, Sr. with those contracts for the performance of work in progress at the time of the execution of the documents. (Plaintiff's Exhibits 253-254). Additionally, BCCI pledged as security for the guarantee of Robert Brindley, Sr.'s personal loan certain vehicles, including trucks, dump trucks, and other automobiles. (Plaintiff's Exhibit 255). In order to perfect the security interest, customers of BCCI were informed that BCCI "has entered into agreements with First National Bank…. Future payments under the contract should be made directly to Brindley Construction Company, Inc. and First National Bank." (Plaintiff's Exhibit 254). Ricky White, Controller for BCCI, testified that in further payment of the guarantee of Robert Brindley, Sr.'s personal obligations, various tangible assets, including vehicles, were tendered to the bank. (Docket Entry No. 215, Trial Transcript at pp. 671-72).

BCCI's 1992 and 1993 financial statements fail to reflect evidence of loans by Robert Brindley, Sr. to BCCI that would support the guarantee of Robert Brindley, Sr.'s $385,000 personal loan. (Docket Entry No. 214, Trial Transcript at p. 243). The 1992 and 1993 tax returns of BCCI, and the testimony of Ricky White, controller for BCCI, reflect no loans or carryovers of loans from shareholders at any time between 1992 and 1993. Id. at pp. 244-45.

Robert Brindley, Sr. alleged on his 1993 tax return a forgiveness of debt of loans by him to BCCI. (Plaintiff's Exhibit 1). The forgiveness of debt reflected on the 1993 tax returns of Robert Brindley, Sr. and BCCI was for $268,633.151. As the loan guarantee to First National Bank of Pulaski was a guarantee of $385,000, and the forgiveness of debt was for $268,000, the difference between those amounts implies, at a minimum, that approximately $117,000 of the purported obligation was paid on Robert Brindley, Sr.'s personal obligation. (Docket Entry No. 214, Trial Transcript at p. 362).

14

Heather Herrington, Deputy Assessor of Personal Property for the Giles County Tax Assessor's Office, testified at trial concerning the maintenance of personal property records in Giles County. (Docket Entry No. 213, Trial Transcript at p. 50). On an annual basis, the Giles County Tax Assessor prepares and issues a tangible personal property schedule to taxpayers who own tangible personal property in Giles County. Id. The tax records of the Giles County Tax Assessor's Office reveal that BCCI is listed as doing business under the name of succeeding entities, and that, rather than actually selling the assets from one entity to the next, BCCI continues to maintain title to the assets and simply changes its name through time. (Docket Entry No. 214, Trial Transcript at p. 263).

Where a particular taxpayer was in business the prior year, the prior year's information reflecting the name and address of the licensed business, the owner of the real estate, the business owner, and the contact person is preprinted by the Tax Assessor before it is issued to the business. (Docket Entry No. 213, Trial Transcript at p. 50). The annual tangible personal property schedule further reflects the tangible property owned in prior years by the taxpayer. Id. at p. 55. The property owned by the taxpayer in prior years is categorized by type, including furniture, fixtures, general equipment, etc., and reflects that property owned in the prior year as depreciated by law. Id. at pp. 54-55. Where a new business entity begins operating in Giles County, the Giles County Tax Assessor prepares a new tangible personal property schedule reflecting the name and other relevant information from the business license acquired by the new taxpayer. Id. at p. 55. In the case of a preexisting entity, that taxpayer is responsible for informing the Giles County Tax Assessor of any personal property disposed of since the last filing, and, new property acquired during the tax year. Id. at p. 58. A new business responding for the first time to the Giles County Tax Assessor's request for information concerning tangible

15

personal property reflects the purchase price of the tangible personal property listed in the various categories. Id. at p. 55. In short, the Giles County Tax Assessor relies upon the taxpayer's representations as to the continuance of a preexisting business under a trade name, or alternatively, the creation of a new business entity. Id. at p. 53.

Ricky White testified that he was responsible for the preparation of documents submitted to the Giles County Tax Assessor. Id. at p. 108. White testified that newly acquired property should be reflected on the appropriate tax records at the acquisition price rather than the amount to which the seller had depreciated the property. Id. White testified that the various vehicles listed as owned on BCCI's tangible personal property tax return in Giles County were in fact owned by BCCI. Id. at 110.

In 1989, BCCI filed its annual tangible personal property schedule with the Giles County Tax Assessor's Office, reflecting assets acquired prior to 1982. Id. at p. 66. In 1990, 1991, 1992, 1993, 1994, 1995, 1996, and 1997 BCCI averred to the Tax Assessor of Giles County that it was doing business and continuing to depreciate assets previously acquired. Id. at pp. 67-68.

In 1998, the tax form was revised to reflect the trade name, Brindley Construction Group, LLC, but the depreciations continued unabated. Id. at pp. 61, 69. In 1999, upon the request of BCCI, the business name was changed by the Giles County Assessor's Office to Brindley Construction Group, LLC, however, the depreciation schedule continued unabated. Id. at pp. 62-65, 69. The 1999 tangible personal property schedule attachments reflect assets acquired as early as 1994, but Brindley Construction Group, LLC did not exist in 1994. Id. at pp. 63-64; Docket Entry No. 106-5 at 21; Defendants' Exhibit 8.

Brindley Construction Group, LLC also provided to the Giles County Tax Assessor's Office documentation reflecting property acquired by Brindley Company, Inc. doing business as

16

Brindley Construction, LLC. (Plaintiff's Exhibit 279). Among the documentation provided to the Giles County Tax Assessor in 2000 was property acquired in 1985, 1986, 1987, 1988, and 1992. (Plaintiff's Exhibit 280). From 2001-2008, Brindley Construction Group, LLC continued the depreciation of assets with the Giles County Tax Assessor's Office. (Docket Entry No. 213, Trial Transcript at p. 69). The forms reflect a continuation of the depreciation of assets with Brindley Construction Group, LLC merely substituted for the name of BCCI. Plaintiff's Exhibits 282-290. In 2009, BCCI continued the depreciation of property, however, the name under which BCCI was operating was altered to Brindley Construction, LLC. (Plaintiff's Exhibit 290).

Through the public records of Giles County, BCCI has represented that it has continued to operate as one business entity since at least 1981. BCCI's UCC-1 instrument with First National Bank of Pulaski reflects the items it alleged it owned and listed with the Giles County Tax Assessor's Office. (Plaintiff's Exhibits 252-253). While Defendants' controller, Ricky White, asserted that certain of the items listed as owned by BCCI were in fact owned by Robert Brindley, Sr., but he could not explain why those items were listed as owned by BCCI to First National Bank of Pulaski when BCCI executed its UCC-1 instrument with the bank. (Docket Entry No. 213, Trial Transcript at p. 111).

Through the continuation of BCCI under various trade names, Robert Brindley, Sr. and the Brindley entities have commingled assets and treated the Brindley entities as one business entity. (Docket Entry No. 214, Trial Transcript at pp. 225-26). The transfer and use of BCCI's tangible personal property by the Brindley entities occurred through the control of the Brindley entities by Robert Brindley, Sr.

On April 13, 2002, Brindley Holdings, L.P. was created as a Tennessee Limited

Partnership. (Defendants' Exhibit 7; Plaintiff's Exhibit 203). Brindley Holdings, L.P. provided no financial statements in response to discovery. (Docket Entry No. 214, Trial Transcript at p. 214). The minutes of Brindley Holdings, L.P. reflect the numerous properties transferred from unexplained sources to Brindley Holdings, L.P. upon its creation. (Plaintiff's Exhibits 203, 204). The 16 pieces of properties listed as transferred to Brindley Holdings, L.P. upon its inception are valued at $1,604,825. (Defendants' Exhibit 7). Ronald Brindley was a limited partner of Brindley Holdings, L.P. and The Robert Brindley, Sr. Trust was a general partner of Brindley Holdings, L.P. during the existence of Brindley Holdings, L.P. and when assets of Ronald Brindley, Robert Brindley, Sr. and various Brindley entities were transferred to Brindley Holdings, L.P. (Plaintiff's Exhibit 222; Defendants' Exhibit 7). No explanation is given detailing how the partnership received those 16 pieces of property acquired at the creation of Brindley Holdings, L.P. (Plaintiff's Exhibit 203, Defendants' Exhibit 7).

Tracy Armstrong, Deputy Assessor of the Giles County Tax Assessor's Office, testified at trial concerning the maintenance of Giles County real property records. (Docket Entry No. 213, Trial Transcript at pp. 88-93). Armstrong explained that the Giles County Assessor's Office maintains a real property title transfer record reflecting sales or name changes on a sequential basis. Id. at p. 89. The record of transfer of realty for Giles County, Tennessee is derived by employees of the Assessor's Office from the contracts of sale or transfers of real estate between the purchaser and seller. Id. at p. 92. The sequential listing of transfers of realty included the seller, the buyer, the acreage or lot description, the price, and other information. Id. at pp. 90-92. The Giles County Assessor's Office also maintains "blue cards" which provide a quick reference as to the owners in sequence of real property within Giles County. Id. at p. 92.

While the records of Brindley Holdings, L.P. fail to reflect the transfer of properties from

18

the various Brindley entities to Brindley Holdings L.P., the records of the Giles County Tax Assessor's office in fact reflect such transfers. (Plaintiff's Exhibit 293). The Giles County Tax Assessor's office 2010 report reflects 28 properties owned by Brindley Holdings, L.P. that were not listed in the initial acquisition by Brindley Holdings L.P., but are listed as being owned by Brindley Holdings, L.P. Id. Their acquisitions by Brindley Holdings, L.P. from Robert Brindley, Sr., Ronald Brindley, or any of the Brindley entities are also not reflected in the minutes or other records of Brindley Holdings, L.P. (Docket Entry No. 214, Trial Transcript at p. 273).

Nine properties owned by Brindley Holdings, L.P. were pledged as collateral for a loan in the name of Robert Brindley, Sr. at First National Bank of Pulaski. (Plaintiff's Exhibit 210). No justification or information exists in the records of Brindley Holdings, L.P. explaining the pledging of collateral of the limited partnership. (Defendants' Exhibit 7). The Giles County Tax Assessor's records reflect that as of January 15, 2010, six properties acquired by Brindley Holdings, L.P. upon its inception are no longer on the Giles County Tax Assessor rolls. (Plaintiff's Exhibit 292). No records reflect the mechanism for disposing of the six pieces of property acquired by Brindley Holdings, L.P. at its inception. (Defendants' Exhibit 7). The corporate minutes of Brindley Holdings, L.P. do reflect a quitclaim deed from Ronald Brindley to Brindley Holdings, L.P. (Plaintiff's Exhibit 206). That same property acquired by Brindley Holdings, L.P. from Ronald Brindley was then transferred to Robert Brindley, Sr. (Plaintiff's Exhibit 207). The records of Brindley Holdings, L.P. do not reflect the value received by Brindley Holdings, L.P. for the property transferred to Robert Brindley, Sr., or the value of the property itself.

On November 21, 2003, the partners of Brindley Holdings, L.P. approved the execution

of two promissory notes in favor of First National Bank of Pulaski in the respective amounts of $1,506,374.90 and $197,685.67. (Defendants' Exhibit 7; Plaintiff's Exhibit 208). On November 25, 2003, Brindley & Associates assigned leases held by it to First National Bank of Pulaski as collateral for the two notes executed by Brindley Holdings, L.P. (Plaintiff's Exhibit 186). The corporate records of Brindley & Associates or the records of Brindley Holdings, L.P. do not provide any explanation for the assignment of assets. Id.

On December 19, 2005, the partners of Brindley Holdings, L.P. authorized the pledging of collateral for a loan from First National Bank of Pulaski in the amount of $550,000 in the name of Robert Brindley, Sr. and Mike Hedges. (Defendants' Exhibit 7; Plaintiff's Exhibit 210). Brindley Holdings, L.P. failed to offer testimony or tender any documents necessary to explain the transfer of assets among the Brindley Defendants and itself. BCCI and the other Brindley entities transferred assets to Brindley Holdings, L.P. when the transferors were unable to pay their debts in the usual course of business. The transfer of assets of the various Brindley entities and Robert Brindley, Sr. to Brindley Holdings L.P. without consideration, or for inadequate consideration, has left the grantors insolvent.

Brindley & Associates was formed on July 12, 1976 and remains active. (Plaintiff's Exhibit 222). On November 25, 2003, Brindley & Associates assigned leases held by it to First National Bank of Pulaski as collateral for two notes executed by Brindley Holdings, L.P. in the respective amounts of $1,506,374.90 and $190,685.60. (Plaintiff's Exhibit 186). There is not any explanation in either the corporate records of Brindley & Associates or the corporate records of Brindley Holdings, L.P. for the assignment of assets or income. Id. As BCCI was winding down, BCCI transferred contracts to the successor Brindley entity, The Brindley Company. (Docket Entry No. 214, Trial Transcript at p. 242). Contracts that appeared on the books of

BCCI in 1992 reappeared using the same contract numbers and other descriptions in 1993 on the books of The Brindley Company. Id. at 237. BCCI received no value for the transfer of the ongoing contract from Avex Electric when it transferred that contract to The Brindley Company. Id. The Brindley Company made a gross profit of $130,641 on the Avex contract that had been transferred without consideration from BCCI. Id. at 241.

BCCI also had employees that moved to The Brindley Company and successively to other Brindley entities. Id. at 257. The transfer of such a set of employees is an intangible asset for which compensation should occur. Id.

On January 11, 1994, Robert Brindley, Sr. and Ronald Brindley sold 75% of the stock in The Brindley Company to Robert Keeper. (Plaintiff's Exhibits 166, 183). As a condition of the sale, Robert Brindley, Sr. agreed that Robert Brindley, Sr. would not to compete with The Brindley Company. (Plaintiff's Exhibit 166). In the agreement for purchase and sale of stock between Robert Brindley, Sr., Ronald Brindley, and Robert Keeper the parties agreed that Robert Brindley, Sr. would "use his best efforts to obtain construction contracts" for the new company. Id.

The agreement not to compete with The Brindley Company included Robert Brindley, Sr., Ronald Brindley, and the other Brindley entities. (Docket Entry No. 214, Trial Transcript at pp. 253, 254-56, 257). Compensation for the agreement not to compete and the agreement to bring business to The Brindley Company was received by the shareholders of BCCI, Robert Brindley, Sr., and Ronald Brindley, rather than by BCCI. Id. at pp. 253-54. The undermining of the profit maximization mandate of the various Brindley entities was to the detriment of their creditors and other third parties. Id. at 226. This transaction reflects the maintenance of the Brindley entities as the alter ego of Robert Brindley, Sr. (Plaintiff's Exhibit 227).

On September 1, 1997, when The Brindley Company's assets were transferred to Brindley Construction Group, LLC, Ronald Brindley and Robert Brindley, Sr. were shareholders and/or officers of The Brindley Company and Brindley Construction Company, Inc. (Defendants' Exhibit 11). The sale of assets between Brindley Construction Group, LLC and The Brindley Company dated September 1, 1997 was for substantially less than fair market value. (Docket Entry No. 214, Trial Transcript at pp. 258-60). While the assets of The Brindley Company were transferred to Brindley Construction Group, LLC for $12,167, the actual value of the assets transferred was at least $100,000. Id.

From February 28, 2006 through December 2006, Brindley Construction Group, LLC purports to have billed Brindley Construction, LLC for overhead, but an estimate for the actual cost of the overhead does not exist. Id. at p. 230. Brindley Construction Group, LLC transferred its assets in 2007 to Brindley Construction, LLC (formerly The Brindley Company, LLC). Id. at p. 261. In the 2007 transfer of Brindley Construction Group, LLC's assets to Brindley Construction, LLC, the books and records of these corporations do not reflect a calculation of fair market value. Id.

Robert Brindley, Sr. acknowledged that in 2004 Brindley & Associates operated out of 747 West College in Pulaski, Tennessee. (Docket Entry No. 213, Trial Transcript at p. 172). Brindley & Associates had "two office spaces" at 747 West College in Pulaski, Tennessee in 2004. Id. While BCCI paid rent at 747 West College in Pulaski, Tennessee, Brindley & Associates did not pay rent at that location. Id. at p. 173.

Ricky White performed services for multiple of the Brindley entities, but was always paid by only one of the Brindley entities. Id. at 97. Robert Brindley, Sr. acknowledged that the various Brindley entities used each other's equipment without compensation. Id. at 174. The

Brindley entities as a group had the same post office box, the same phone number, and the same receptionist. (Docket Entry No. 214, Trial Transcript at p. 263).

The various Brindley entities often used one another's letterhead. Id. When one Brindley entity was shutting down or being created, the credit card of another Brindley entity was used for that transaction. Id. One of the Brindley entities' stamps was used on bills or receipts for those of other Brindley entities. Id. The Brindley entities used the same external accountants and same attorney. Id. at 264. In discovery, the various Brindley entities provided similar deposition testimony and tendered the same set of records. Id.

While the Brindley Defendants allege they are independent entities; the various Brindley entities, Robert Brindley, Sr., and Ronald Brindley intentionally represented to particular individuals and to the public generally that they are one business entity and thereby taking undue advantage of such representations. Id. at 252. In 1992, when informing its customers to forward future payments to First National Bank of Pulaski, BCCI noted that, "BCC will continue to give excellent service and to satisfy its customers, just like it has for the past 35 years." (Plaintiff's Exhibit 254). BCCI represented to the public via its website that Brindley Construction Company was, "established in 1960 by Robert Brindley...." (Plaintiff's Exhibit 259).

BCCI and the other Brindley entities provided the public with a single business address and with a single series of phone numbers. (Docket Entry No. 214, Trial Transcript at p. 252). Robert Brindley, Sr. and other employees of the various Brindley entities intentionally acted in a manner to make it appear to Plaintiff through its representative, Nelson Chatelain, that all of the various activities of the Brindley entities witnessed by him were those of a single enterprise, more particularly, BCCI. (Docket Entry No. 213, Trial Transcript at p. 37).

BCCI failed to avail itself properly of the procedures for dissolution. BCCI filed Articles

of Dissolution with the Tennessee Secretary of State on December 31, 2001. (Docket Entry No. 30, Memorandum at p. 4). BCCI failed to publish notice of its dissolution in a newspaper of general circulation in Giles County, Tennessee, where BCCI had its principal office. BCCI failed to notify Plaintiff in writing of its effort to dissolve. Id. BCCI failed to notify Plaintiff of that information needed to support its claim. Id. at p. 8. BCCI did not properly avail itself of the procedures for the shorter statute of limitations on existing claims. Id. at p. 12.

Robert Brindley, Sr. signed the documents for the dissolution of BCCI filed with the Secretary of State of Tennessee. (Docket Entry No. 213, Trial Transcript at p. 177). No formal meeting of the directors or officers of BCCI occurred prior to the filing for dissolution by Robert Brindley, Sr. Id. at 178. No officers or directors of BCCI had been elected since 1992. Id. In its Articles of Dissolution filed with the Secretary of State of Tennessee on May 10, 2001, BCCI, through Robert Brindley, Sr., stated that "no debt of the corporation remains unpaid." (Plaintiff's Exhibit 45). Among the debts that in fact did exist was the debt of BCCI to Plaintiff that forms the basis for this action. (Docket Entry No. 213, Trial Transcript at p. 179).

B. Riney Green, Defendants' expert, acknowledged that where a corporation or other entity is unable to pay its creditors, a "return on capital...after some kind of liquidation of assets" makes a stockholder, member, or general partner liable to the creditors. (Docket Entry No. 215, Trial Transcript at p. 637). Green also noted that as one of the directors and as a shareholder, individuals have, "a duty...to make sure that he doesn't receive, for his benefit, whatever the liquidating value of the company...when it's insolvent...." The director or shareholder must, "make sure the creditors get paid first." Id. at 651.

Robert Davidson, controller for the various Brindley entities, acknowledged that it would have been improper and unacceptable for BCCI to transfer assets to Robert Brindley, Sr.'s name

or any other of his related parties in 1992 or 1993. Id. at 543. BCCI received no benefit for the guarantee of Robert Brindley, Sr.'s loan; such a transaction is a liquidating distribution for which Robert Brindley, Sr. is liable. (Docket Entry No. 213, Trial Transcript at p. 89). The payment of Robert Brindley, Sr.'s loan to First National Bank of Pulaski pursuant to BCCI's October 9, 1992 resolution was a distribution of assets to Robert Brindley, Sr. when the total assets of BCCI were less than the sum of its total liabilities and the amount needed to satisfy the preferential rights upon dissolution of shareholders.

At trial, the Plaintiff's expert, Dr. Nicole Thorne Jenkins, testified that she reviewed the documents tendered by the Defendants in discovery and reviewed depositions in this action, the records of the Giles County Tax Assessor's Office, Court proceedings, and other documents. (Plaintiff's Exhibit 294). Defendants' expert, B. Riney Green, acknowledged that he reviewed only documents related to five of the 13 Defendants: BCCI, Brindley & Associates, Inc., Brindley Homes, The Brindley Company, LP, and The Brindley Company, Inc. (Docket Entry No. 215, Trial Transcript at p. 655). An analysis of only five of the Brindley Defendants cannot provide a complete view of the interrelationship between the various Defendants, and the Court thus places greater weight on the testimony of the Plaintiff's expert. (Docket Entry No. 214, Trial Transcript at pp. 219-20).

As part of a controlled group, pursuant to Section 1561(a) of the Tax Code, the Brindley entities are recognized as having common ownership. Id. at p. 228. Generally accepted business practices require that as interrelated companies and individuals the Brindley Defendants should have gone to great lengths to insure that their transactions were "arm's length." Here, the Brindley entities failed to take those steps necessary to insure that their transactions were arm's length transactions. Id.

25

As interrelated entities who conducted business among themselves, the Brindley entities and individuals should have insured the sales price between them was similar to or the same as the sales price that would occur between independent third parties. Here, the Brindley entities and individual Defendants failed to insure that the sales price between them was the same as the sales price that would have occurred between independent third parties. Id. at p. 229. Generally accepted business practices require that transactions between interrelated individuals and companies should assure that if there are loans between interrelated entities and individuals, they are documented with the principal and interest, schedule of payments, and other arm's length indices. Here, the Brindley entities failed to produce such documents. Id. at p. 265.

Where contracts are transferred from one related entity to another and the receiving entity profits from that contract, the contract should be transferred at a reasonable value. Here, the Brindley Defendants failed to produce such documents that would show that contracts were transferred at reasonable value. Id. at p. 229. Generally accepted business practices require that, where interrelated entities transfer assets, generally accepted business practices require an appraisal of the assets transferred. Here, the Brindley Defendants have failed to provide such appraisals. Id. at p. 350.

Generally accepted business practices require that, when dealing with individuals or with the public, business entities should assure that its independence is reflected in its actions and its disclosures. Here, the Brindley Defendants failed to assure the independence of the Brindley entities in either their actions or their disclosure. Id. at p. 252.

As to Ronald Brindley, however, the only basis for liability presented at trial by Plaintiff's expert was Ronald Brindley's position as an officer and director of BCCI and his ownership interest in the various Brindley entities. Ronald Brindley never owned an interest in

BCCI and received no distributions or assets from BCCI directly. (Docket Entry No. 213, Trial Transcript at p. 171; Docket Entry No. 215, Trial Transcript at p. 681).

## B. Conclusions of Law

As previously determined by this Court, Tennessee law governs this diversity action. (Docket Entry No. 30, Court's Memorandum at 7-8). Under Tennessee law, "[t]here is a presumption that a corporation is a distinct entity, separate from its shareholders, officers, directors or affiliated corporations." Schlater v. Haynie, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991). The corporation's separate legal status protects its shareholders, officers, directors or affiliated corporations from the corporation's liabilities to its creditors. Pamperin v. Streamline MFG., Inc., 276 S.W.3d 428, 436-37 (Tenn. Ct. App. 2008). Yet, the corporate veil may be pierced and the directors, officers, shareholders and affiliated corporations may be held liable to a creditor for the actions of the corporation where there is "some violation of statutory duty or other conduct which establishes a privity of contract with or tortious injury to the creditor." Schlater, 833 S.W.2d at 924. Thus, the "separate identity of a corporation may be disregarded upon a showing that it is a sham or a dummy or where necessary to accomplish justice." Id. at 925. In such an instance, "a corporation and the individual or individuals owning all its stock and assets will be treated as identical." Id.

"Piercing the corporate veil is an equitable doctrine to prevent the use of a corporate entity to defraud or perform illegal acts." Nepp v. Hart, No. M2005-2024-COA-R3-CV, 2006 WL 2582503, at *7 (Tenn. Ct. App. September 7, 2006); Schlater, 833 S.W.2d at 925 ("Even though corporate formalities have been observed, one may still challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result."). The piercing of the

27

corporate veil "is to be applied with great caution and not precipitately, since there is a presumption of corporate regularity." Schlater, 833 S.W.2d at 925. The decision to disregard the corporate entity varies according to the special circumstances of each case, and "the matter is particularly within the province of the trial court." Oceanic Schools, Inc. v. Barbour, 112 S.W.3d 135, 526 (Tenn. Ct. App. 2003) (quoting Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp., 691 S.W.2d 522, 526 (Tenn. 1985)). "Generally, no one factor is conclusive in determining whether or not to disregard a corporate entity." Schlater, 833 S.W.2d at 925. Instead, courts usually rely on a combination of factors in a particular case to resolve the issue. Id.

In Continental Bankers Life Ins. Co. of the South v. Bank of Alamo, 578 S.W.2d 625 (Tenn. 1979), the Tennessee Supreme Court set forth the following factors necessary to pierce the corporate veil:

> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

> (2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Id. at 632.

In Pamperin, the Tennessee Court of Appeals stated that these elements applied in instances where a subsidiary corporation was used as a mere instrumentality of a parent corporation. 276 S.W.3d at 437. Yet, the Pamperin Court noted that some Tennessee courts have required these elements "in actions seeking to impose individual liability on a shareholder

of a corporation who is in reality the corporation's alter ego." 276 S.W.3d at 4378 (citing Island

Brook Homeowners Ass'n, Inc. v. Aughenbaugh, No. M2006-02317-COA-R3-CV, 2007 WL

2917781, at *6 (Tenn. Ct. App. Oct. 5, 2007); Tennessee Racquetball Investors, Ltd. v. Bell, 709

S.W.2d 617, 622 (Tenn. Ct. App. 1986)). The Pamperin Court, however, also noted that the

Schlater Court found Continental Bankers inapplicable as that case addressed parent/subsidiary

relationships while the case before the Schlater Court involved a corporation/stockholder

relationship. Pamperin, 276 S.W.3d at 438 (citing Schlater, 833 S.W.2d at 925).

The Pamperin Court explained that the "most common factors used by Tennessee courts

to determine whether to pierce the corporate veil" are set forth in Federal Deposit Ins. Corp. v.

Allen, 584 F. Supp. 386 (E.D. Tenn. 1984). Those factors are as follows:

> Factors to be considered in determining whether to disregard the corporate veil
> include not only whether the entity has been used to work a fraud or injustice in
> contravention of public policy, but also: (1) whether there was a failure to collect
> paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the
> nonissuance of stock certificates; (4) the sole ownership of stock by one
> individual; (5) the use of the same office or business location; (6) the employment
> of the same employees or attorneys; (7) the use of the corporation as an
> instrumentality or business conduit for an individual or another corporation; (8)
> the diversion of corporate assets by or to a stockholder or other entity to the
> detriment of creditors, or the manipulation of assets and liabilities in another; (9)
> the use of the corporation as a subterfuge in illegal transactions; (10) the
> formation and use of the corporation to transfer to it the existing liability of
> another person or entity; and (11) the failure to maintain arms length relationships
> among related entities.

Allen, 584 F. Supp. at 397 (citations omitted); see Southeast Texas Inns, Inc. v. Prime

Hospitality Corp., 462 F.3d 666, 675-76 (6th Cir. 2006) (footnote omitted) ("Beside the

indispensable elements of complete dominion and control and the sanction of fraud or injustice

by the corporate form, the courts of Tennessee . . . also consider certain common, non-exclusive

factors in determining whether to disregard the corporate veil," citing the Allen factors.). "It is

not necessary that all of these factors weigh in a plaintiff's favor in order to justify the piercing

of the corporate veil." Oceanic Schools, 112 S.W.3d at 140.

"[A] determination of whether or not a corporation is a mere instrumentality of an individual or a parent corporation is ordinarily a question of fact for the jury." Electric Power Bd., 691 S.W.2d at 526; Pamperin, 276 S.W.3d at 437. "The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief." Oceanic Schools, 112 S.W.3d at 140 (citing Schlater, 833 S.W.2d at 925). The Court should approach the issue of piercing the corporate veil "with due caution and awareness for the fact that the question is usually a fact-intensive one." WYCQ, Inc. v. National Music Mktg., Inc., No. 3:05-cv-0979, 2008 WL 56027, at *11 (M.D. Tenn. January 3, 2008).

As noted by the Tennessee Court of Appeals in Schlater and Pamperin, Continental Bankers only applied in the parent/subsidiary relationship. Schlater, 833 S.W.2d at 925; Pamperin, 276 S.W.3d at 438. "When piercing the corporate veil, a court may disregard the corporate entity in order to impose liability against a related entity, such as a parent corporation or a controlling shareholder, where the two entities are in fact identical or indistinguishable and where necessary to accomplish justice." Pamperin, 276 S.W.3d at 437 (emphasis added).

According to Plaintiff's expert, the Brindley entities acted as a single enterprise and BCCI transferred its assets to The Brindley Company, Inc., diverting the profitability of BCCI to other members of the Brindley entities. One of the Allen factors to be considered is "the use of the corporation as an instrumentality or business conduit for an individual or another corporation." Allen, 584 F. Supp. at 397. Plaintiff has established that the Brindley entities act as a conduit for one another.

The Court previously determined that "Plaintiff's claims are focused entirely on its attempt to collect on the prior judgment rendered in the Northern District of Alabama," and are

not assertions of new claims. (Docket Entry No. 30 at 12). "A suit against an alter ego in which the plaintiff seeks to pierce the corporate veil in connection with a previously-obtained judgment against a corporation is not 'a separate and independent cause of action.'" Oceanic Schools, 112 S.W.3d at 145 (citation omitted). "When a plaintiff obtains a judgment against the corporate entity, it also obtains a judgment as to any of its alter egos." Boles v. National Dev. Co., Inc., 175 S.W.3d 226, 251 (Tenn. Ct. App. 2005) (emphasis added); Oceanic Schools, 112 S.W.3d at 145; Altice v. NATS, Inc., 2008 WL 1744571, at *2. Thus, "[o]nce a trial court has determined that an individual is a corporate entity's other self and a judgment against the corporate entity is in place, then there is also in place a judgment against the individual who is the corporate entity's other self. This is because the individual is no longer a legally separate entity from the corporate debtor." Id.

Through the gratuitous payment of Robert Brindley, Sr.'s loan to First National Bank of Pulaski, Robert Brindley, Sr. and the Brindley entities have utilized the Brindley entities, and more particularly BCCI, to avoid paying the original judgment. The guarantee, security, and payment by BCCI of Robert Brindley, Sr.'s loan to First National Bank of Pulaski is a violation of a statutory duty that has injured Plaintiff. The transfer of assets of BCCI to Robert Brindley, Sr. for inadequate consideration left BCCI insolvent, to the detriment of its creditors, including Plaintiff.

The Court concludes that management of the Brindley entities engaged in actions inconsistent with normal business purposes of an independent business organization. Assets of the various Brindley entities were transferred among the Brindley entities without payment for the assets or a determination of fair market value. Through the transfer of assets among the Brindley entities, those entities did not operate as independent business entities acting in their

31

own interests. The Brindley entities acted as component members of a controlled group of companies that commingled assets and undermined profit maximization of various Brindley entities.

Despite the Defendants' contentions that they operated as discreet and proper business entities, the lack of proper business records, particularly those involving the wind down of BCCI after the judgment was issued in the prior litigation, belies Defendants' contention. A legal duty to preserve relevant information arises when a person "knew or should have known that the documents would become material at some point in the future then such documents should have been preserved." Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746 (8th Cir. 2003). As to when this duty arises, the federal courts have held that the duty to preserve relevant information clearly arises when a complaint is filed with a court. Computer Associates, Intern., Inc. v. American Fundware, Inc., 133 F.R.D. 166, 169 (D. Colo. 1990); Telectron Inc. v. Overhead Door Corp., 116 F.R.D. 107, 127 (S.D. Fla. 1987). A duty to preserve may also arise before the filing of the complaint, if a party has notice that litigation of a matter is likely to be filed. Cappelupo v. FMC Corp., 126 F.R.D. 545, 551 (D. Minn. 1989); Alliance to End Repression v. Rochford, 75 F.R.D. 438, 440 (N.D. Ill. 1976). The duty to preserve does not include evidence that the party "had no reasonable notice of the need to retain." Danna v. New York Tel. Co., 752 F. Supp. 594, 616 n.9 (S.D.N.Y. 1990), but includes information that party "has control and reasonably knew or could reasonably foresee was material to a potential legal action." Krumwiede v. Brighton Associates, LLC, No. 05 C 3003, 2006 WL1308629 at *8 (N.D. Ill. May 8, 2006) (citations omitted).

"Once on notice [that evidence is relevant], the obligation to preserve evidence runs first to counsel, who then has a duty to advise and explain to the client its obligations to retain

pertinent documents that may be relevant to the litigation." Telecom International Am. Ltd. v.

AT&T Corp., 189 F.R.D. 76, 81 (S.D.N.Y. 1999) (citing Kansas-Nebraska Natural Gas Co. v.

Marathon Oil Co., 109 F.R.D. 12, 18 (D. Neb. 1983)). Neither a preservation demand letter nor

a court order is required. Wiginton v. Ellis, 2003 WL 22439865 at **4, 5 (N.D. Ill. Oct. 27,

2003). A preservation order only clarifies the parties' particular obligation. Treppel v. Biovail

Corp., 233 F.R.D. 363, 369 (S.D.N.Y. 2006).

This preservation duty extends to the parties' outside counsel and beyond the mere

issuance of a litigation hold. In Zubulake v. UBS Warburg, LLC, 229 F.R.D. 422 (S.D.N.Y.

2004) ("Zubulake V"), contrary to outside and in-house counsel's instructions, key employees of

the defendant deleted e-mails that the plaintiff alleged would support her claims. In Zubulake V,

the court summarized its 2003 decision in (quoting Zubulake v. USB Warburg, LLC, 220 F.R.D.

212, 218 (S.D.N.Y. 2003) ("Zubulake IV")) and delineated the types of measures stated therein

as necessary for outside counsel to monitor his client's behavior and the timely production of

information. 229 F.R.D. at 435.

> A party's discovery obligations do not end with the implementation of a "litigation hold"--to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. Proper communication between a party and her lawyer will ensure (1) that all relevant information (or at least all sources of relevant information) is discovered, (2) that relevant information is retained on a continuing basis; and (3) that relevant non-privileged material is produced to the opposing party.

229 F.R.D. at 432-34. See also Rebecca Rockwood, Note, Shifting Burdens and Concealing

Electronic Evidence: Discovery in the Digital Era, 12 RICH. J.L. & TECH. 16, 22 (2006) ("It is

counsel's responsibility not just to tell the client that they have to retain and produce all

information relevant to the case, but also to follow up with the client and continuously remind

them of what they are required to do....Clients must be aware of all duties to preserve

information, 'whether imposed by litigation or state or federal regulation.' Until the client begins to realize the impact of technology in litigation, the lawyer must educate them to provide the best service and avoid sanctions litigation that could be damaging.") (footnotes omitted).

Prior to the filing of this litigation, the Defendants and their counsel owed a duty to preserve all evidence and information that they knew or should have known was relevant to this action. As the Sixth Circuit has stated, "it is beyond question that a party to civil litigation has a duty to preserve relevant information…when that party 'has notice that the evidence is relevant to litigation or . . . should have known that the evidence may be relevant to future litigation.'" John B., 531 F.3d at 459 (quoting Fujitsu v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001)).

Examining the eleven factors set forth in Allen, the Court concludes that piercing the corporate veil as to the Brindley entities and Robert Brindley, Sr. is appropriate here. 584 F. Supp. at 397. BCCI became undercapitalized through the guarantee of Robert Brindley, Sr.'s loan and other conveyances to Brindley entities. The Brindley entities also utilized the same offices, staff, and corporate assets without providing compensation for transfers of these assets between the Brindley entities. The temporal proximity of the transfer of assets, guarantee of Robert Brindley, Sr.'s loan, and winding down of BCCI with the issuance of Plaintiff's prior judgment gives rise to a strong inference that these actions were taken to perpetuate a fraud against the creditors of BCCI. The Court thus concludes that the Plaintiff has shown through a preponderance of the evidence that Robert Brindley, Sr. and the Brindley entities are liable to the Plaintiff as the alter-egos of BCCI.

As to Ronald Brindley, however, the evidence presented at trial only established his position as a director, officer, or owner of the various Brindley entities. Plaintiff did not present

any evidence that Ronald Brindley participated in the scheme to defraud the creditors of BCCI from 1990-1992. Given the lack of evidence as to Ronald Brindley, the Court concludes that Plaintiff has not met its burden to establish liability against Ronald Brindley by a preponderance of the evidence.

For the reasons stated above, the Court concludes that Defendants Brindley Construction, LLC (formerly The Brindley Company, LLC), Brindley Construction Group, L.L.C., The Brindley Company (formerly Brindley Development Corporation), Brindley & Associates, Inc., Brindley Development Company, L.L.C., Brindley Holdings, L.P., Brindley Homes Corporation, The Brindley Company, L.P., Brindley Construction Company, Inc., and Robert Brindley, Sr. acted as alter-egos to avoid payment of Brindley Construction Company, Inc.'s creditors and debts, particularly the judgment in favor of Plaintiff Huntsville Golf Development, Inc.

Accordingly, the Court shall award Plaintiff $376,316.75, representing the amount of the previous judgment. Any requests for attorneys' fees and/or interest will be submitted to the Court pursuant to the Local Rules.

For the above stated reasons, the Court shall enter a judgment against all Defendants, with the exception of Ronald Brindley, as to Plaintiff's claim of piercing the corporate veil.

An appropriate Order is filed herewith.

**ENTERED** this the ____ day of August, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge